IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALBERT WIRTH, on behalf of himself and the Albert J. Wirth Trust, and FLORENCE T. WIRTH, <br><br> Plaintiffs, <br><br> v. <br><br> ROGER E. TAYLOR, RICHARD T. SMITH, FRANKLIN FORBES ADVISORS, LP., LBS FUND, L.P., LBS ADVISORS, INC., SUMMIT CAPITAL ADVISORS, INC., JEFFREY B. ROYLANCE, JENNETTE L. ROYLANCE, GJB ENTERPRISES, INC., GERALD BURKE a/k/a G.J. BURKE, JASON BUCK, RICHARD C. SCHMITZ, KARI M. LAITINEN, and NEWTON ALLEN TAYLOR, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTIONS TO STRIKE SECOND AMENDED COMPLAINT** <br><br><br><br> Case No. 2:09-cv-127 TS |
| ANNETTE KAY DONNELL, an individual, <br><br> Plaintiff, <br> v. <br><br> ROGER TAYLOR, et al. <br><br> Defendants. | District Judge Ted Stewart <br><br> Magistrate Judge David Nuffer |

Defendants Defendants Jeffrey B. Roylance and Summit Capital Advisors, Inc. have

moved to strike Plaintiff Donnell's second amended complaint[1] because it "is improper under the

Federal Rules of Civil Procedure, different from the version originally allowed by the Court,

untimely, unfair and prejudicial"[2] and "barred by the doctrine of laches."[3]  Defendants LBS

---

[1] Anne Kay Donnell's and AK Limitless, LLC's Second Amended Complaint and Jury Demand, docket no. 219, filed December 14, 2010.

[2] Motion to Strike or Dismiss Annette Kay Donnell's and AK Limitless, LLC's Second Amended Complaint and Jury Demand (Roylance Motion to Strike) at 2, docket no. 225, filed December 28, 2010.

Fund, L.P. and LBS Advisors, Inc. (LBS Defendants) also filed a motion to strike adding that "Donnell has failed to comply with the Court's order allowing Donnell to amend, and has not timely prosecuted her claims."[4] The motions to strike that are at issue in this order also contain requests to dismiss the complaint. This order does not resolve the dismissal component of the motions as they are currently pending before the District Judge.[5]

## Background

On April 16, 2010, the last day for filing motions to amend pleadings,[6] Plaintiff Donnell moved to amend.[7] On August 12, 2010, this Court granted, in part, Donnell's motion.[8] The order required Donnell to modify the proposed amended complaint because the proposed amended complaint included parties as to whom amendment was not allowed.[9] Donnell did not file the second amended complaint until months after the order, "a few days before an agreed mediation"[10] which was held in late December.[11]

---

[3] Memorandum Supporting Motion to Strike or Dismiss Annette Kay Donnell's and AK Limitless, LLC's Second Amended Complaint and Jury Demand (Roylance Memorandum) at 8, docket no. 226, filed December 28, 2010.

[4] Motion to Strike and Dismiss Annette Kay Donnell's and AK Limitless, LLC's Second Amended Complaint (LBS Motion to Strike) at 2, docket no 245, filed January 21, 2011.

[5] See Order Referring Case to Magistrate Judge David Nuffer under 28:636(b)(1)(A), docket no. 55, filed July 27, 2009 ("Magistrate to hear and determine all nondispositive pretrial matters."); Notice Affirming Prior Order of Reference re 55, docket no. 68, filed August 11, 2009.

[6] Scheduling Order, docket no. 104, filed October 14, 2009.

[7] Motion for Leave to Amend First Amended Complaint (Donnell Motion), docket no. 166, filed April 16, 2010.

[8] Memorandum Decision and Order Granting in Part Annette Kay Donnell's Motion for Leave to Amend First Amended Complaint and Granting Albert and Florence T. Wirth's Motion for Leave to Amend to Add New Claims, docket no. 200, filed August 12, 2010.

[9] Id. at 13.

[10] Roylance Memorandum at 2.

[11] Opposition to Motion to Strike or Dismiss Annette Kay Donnell's and AK Limitless, LLC's Second Amended Complaint (Donnell Opposition) at 6, docket no. 251, filed January 28, 2011.

Donnell claims the "timing of the filing, as Defendants were fully aware, was not negligent or done in bad faith, but simply as a result of the flow of settlement negotiations."[12]

## Defendants' Objections

Defendants point out that numerous paragraphs are not the same in the proposed amended complaint and actually filed second amended complaint.[13] The filed second amended complaint contains references to an entity (though not adding that entity as a defendant) and amounts not contained in the proposed amended complaint.[14] The filed second amended complaint contains paragraphs not contained in the proposed amended complaint.[15] Nonetheless, after careful comparison (attached to this order as an exhibit) of the filed second amended complaint and proposed amended complaint the magistrate judge concludes the variances are not significant. In a document of nearly 200 paragraphs, the additions, even the entirely new paragraphs, do not change the substance of the claims or go beyond the authorized leave to amend. A comparison is attached to this order. The changes are factual refinements and statements of additional detail. Striking the variances would not prevent proof of those facts.

Defendants also claim that failure to serve the second amended complaint within 120 days of the order granting leave is a violation of Fed. R. Civ. P. 4(m).[16] That reading is not consistent with the rule and the cases cited are factually distinct. Service was not delayed 120 days after the second amended complaint was filed. The time frames in Rule 4(m) do not run from leave to file.

---

[12] *Id.*

[13] Roylance Memorandum at 6.

[14] *Id.* at 6-7.

[15] *Id.* at 7.

[16] *Id.* at 9.

Defendants claim that they have been prejudiced by the delay.[17]  In light of the attempts to schedule and complete mediation beginning in September and continuing through December, the delay is not inordinate.  The parties' positions were not changing significantly as the mediation was set and postponed.  Any prejudice of the new language in the second amended complaint may be addressed in additional discovery.  "Donnell has stipulated that [Defendants] have the express ability to depose Donnell regarding the Second Amended Complaint."[18]

Defendants claim Donnell's "'slumber' on her proposed new claims for an unreasonable length of time" – four months – constitutes laches.[19]  No authority is cited for the imposition of that doctrine on this time frame.  Further, the delay is explained by the pending mediation.

The LBS Defendants claim the delay in filing is a "failure to prosecute" which allows dismissal under Fed. R. Civ. P. 41(b).  "If a plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it."[20]  However, the cases cited by the LBS Defendants do not match our facts.  In *Schupper v. Edie,*[21] the pro se plaintiff waited well past a second extended deadline for filing and there were no other activities in the case to excuse the delay, as the mediation presented here.  The other cited case, *Tylicki v. Ryan,*[22] is a trial court decision in which the pro se plaintiff not only failed to file the amended complaint but disappeared, "failing to comply with Local Rule 10.1(b)(2) in failing to

---

[17] *Id.* at 10-11.

[18] Donnell Opposition at 8.

[19] Roylance Memorandum at 11.

[20] Fed. R. Civ. P. 41(b).

[21] 193 Fed. Appx. 744 (10th Cir. 2006).

[22]  244 F.R.D. 146 (N.D.N.Y. 2006).

update his address and contact information.  Plaintiff's own failure to update his address has

frustrated this Court's ability to contact him."[23]

Plaintiff Donnell's delay in filing the second amended complaint, while not an exemplary

model for practice, does not present any reason to strike the amended complaint, and the changes

in substance of the complaint similarly are not reason to strike it.

**ORDER**

IT IS HEREBY ORDERED that the motions to strike[24] are DENIED.

Dated February 16, 2011.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge

---

[23] *Id.* at 147.

[24] Docket nos. 225 and 245. Only the Motions to Strike are resolved by this order.  The Motions to Dismiss requested in the motions are pending before the District Judge.

Summary
2/15/2011 10:32:32 AM

Differences exist between documents.

**New Document:**
219 Second Amended Complaint 121410
44 pages (202 KB)
2/15/2011 10:32:21 AM
Used to display results.

**Old Document:**
167-1 Proposed Second Amended Complaint 041610
43 pages (109 KB)
2/15/2011 10:32:21 AM


Get started: first change is on page 1.

No pages were deleted

Comparison of Proposed Amended Complaint and filed Second Amended Complaint attached to order dated February 16, 2011.

Jonathan O. Hafen (6096)
Bryan S. Johansen (9912)
PARR BROWN GEE & LOVELESS
185 South State Street, Suite 800
Salt Lake City, UT 84111
Telephone: (801) 532-7840

*Attorneys for Plaintiff Annette Kay Donnell*
*and AK Limitless, LLC*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANNETTE KAY DONNELL, an individual, and AK LIMITLESS, LLC, <br><br>      Plaintiff, <br><br> vs. <br><br> ROGER E. TAYLOR, an individual; RICHARD T. SMITH, an individual; SMITH HOLDINGS, LLC; SUSAN SMITH; ASCENDUS CAPITAL MANAGEMENT, LLC, a Utah limited liability company; FFCF INVESTORS, LLC, a Utah limited liability company; FRANKLIN FORBES ADVISORS, INC.; GREAT EASTERN SECURITIES; TOUCH TRADE; TOM NEWREN; LBS MANAGEMENT; LBS FUND, L.P.; LBS ADVISORS, INC.; HANS V. ANDERSEN, CPA; HANS V. ANDERSEN ACCOUNTING; CONSILIUM TRADING COMPANY; TEACH ME TO TRADE; LINDA WOOLF; DAVID CHRISTOPHER TAGGART; JEFF ROYLANCE; and SUMMIT CAPITAL ADVISORS, INC.; <br><br>      Defendants. | **ANNETTE KAY DONNELL'S AND AK LIMITLESS, LLC'S** SECOND AMENDED COMPLAINT AND JURY DEMAND <br><br><br><br> Civil No. 2:09cv00127 <br><br> Honorable Judge Ted Stewart |

Plaintiffs Annette Kay Donnell and AK Limitless, LLC (collectively "Donnell") hereby file this Second Amended Complaint and allege the following:

## INTRODUCTORY STATEMENT

1.      Donnell is one of a number of victims who was defrauded and otherwise harmed by Jeff Roylance, Roger Taylor, Richard Smith and various other individuals and companies with whom they conspired.  It appears Donnell was one of the Defendants' largest and earliest victims.

2.      As explained more fully below, Taylor, Smith and Woolf initially induced Donnell to invest her life savings into Taylor's trading program using promises of lucrative returns.  After she invested, Donnell was told that she had made significant profits.  Indeed, as reflected on account statements she was told were reliable, Donnell's account value swelled to over $2.4 million.  As part of her agreements with Taylor and Smith, she paid them and others commissions based on those profits.

3.      However, Taylor and other Defendants failed to follow instructions by Donnell on how to manage her accounts, failed to follow her stated investment objectives, misappropriated funds in her account, mismanaged her margin, and otherwise failed to keep promises made to Donnell.  Subsequently, Roylance promoted an "opportunity" to put money into FFCF Investors, LLC ("FFCF").  Smith conveyed information to Donnell on behalf of Roylance and Roylance's company, Summit Capital Advisors, Inc.  In reliance on representations made by or on behalf of Roylance, Donnell invested substantial funds into Defendant FFCF.

4.      Based on a Subscription Agreement signed by Taylor, and documents some of the Defendants falsified, all of which indicated significant wealth, Donnell did not learn of Defendants' misconduct until mid-2008.

5. On information and belief, prospective investors, including Donnell, were led to believe through a series of false communications, both oral and written, that their investments were guaranteed and they would make substantial profits. After she invested, Donnell was told she was continuing to make money. However, Donnell has recently learned that her investments, including the substantial profits she had made, have disappeared.

6. Donnell's investigation in this matter continues, and she anticipates identifying additional "John Doe" Defendants in the future.

## PARTIES

7. At the time she filed her Complaint Plaintiff Annette Kay Donnell was a resident of Cook County, State of Illinois. Donnell currently is a resident of Salt Lake County, State of Utah. Plaintiff AK Limitless, LLC was a Nevada limited liability company.

8. Defendant Roger E. Taylor ("Taylor") is an individual who currently resides at 1360 Summerwood Circle, Santa Clara, Washington County, Utah 84765. At all relevant times, Taylor acted as Founder and President of Ascendus Capital Management and also as the sole Manager of FFCF Investors, LLC, and sub-advisor and agent of Summit Capital Advisors.

9. Defendant Richard T. Smith ("Smith") is an individual who resides at 443 North 750 East, Orem, Utah County, Utah 84097. At all relevant times, Smith was the Chief Operating Officer of Ascendus Capital Management, LLC, and, on information and belief, had a management and ownership role with FFCF Investors, LLC and Smith Holdings. Smith was not the "Manager" of FFCF. That position was held by Taylor. Smith was also a Director of Superwire, Inc. and Chief Operating Officer of Summit Capital Advisors, Inc.

10.     Defendant FFCF Investors, LLC ("FFCF") is a Utah limited liability company with its former principal place of business at 222 East South Temple, Salt Lake City, Salt Lake County, Utah 84111.

11.     Defendant Franklin Forbes Advisors, Inc. is a California corporation, with its place of business located at 110 Newport Center Drive, Suite 200, Newport Beach, California 92660.  On information and belief, this Defendant is a registered investment advisor.

12.     Defendant Ascendus Capital Management, LLC ("Ascendus") is a Utah limited liability company with its former place of business at 222 East South Temple, Salt Lake City, Salt Lake County, Utah 84111.

13.     On information and belief, Defendant Smith Holdings, LLC ("Smith Holdings") is a Utah limited liability company located at Smith's residence, 443 North 750 East, Orem, Utah County, Utah 84097.

14.     Defendant Great Eastern Securities ("Great Eastern"), is a company of unknown residence that participated in the conspiracy and otherwise held and tracked funds belonging to Donnell.  Great Eastern had a previous business address at 1224 S. Business Park Drive, Suite 230, Draper, Utah 84020.  At all relevant times, Great Eastern did business in Utah.  On information and belief, Great Eastern worked closely with Ascendus, Taylor, Newren, Smith, Taggart, and others, and knew or should have known of irregularities regarding Donnell's accounts.

15.     On information and belief, Defendant Touch Trade is a Utah limited liability company which does or did business in Utah.  Touch Trade did or does business at the same address as Great Eastern.  Touch Trade had or has a close relationship with Great Eastern and

other Defendants.  Touch Trade played a substantial role in managing Donnell's account and knew or should have known of irregularities in her accounts.

16.    On information and belief, Defendant Tom Newren ("Newren") is a Utah or Nevada resident who did business in Utah and was Donnell's primary contact at Touch Trade. Newren played a substantial role in managing Donnell's account and knew or should have known of irregularities in her accounts.

17.    Defendant LBS Management ("LBS") is a corporate entity of unknown residence apparently having as its principal place of business 110 Newport Center Drive, Second Floor, Newport Beach, California 92660.  On information and belief, LBS worked closely with FFCF, Taylor, Smith, Summit Capital Advisors and Roylance and knew or should have known FFCF was a Ponzi scheme.  As an entity managing Donnell's funds, LBS owed fiduciary duties to Donnell.

18.    Defendant LBS Fund, L.P. is a corporate entity having as its principal place of business 110 Newport Center Drive, Second Floor, Suite 200, Newport Beach, California 92660. LBS Fund, L.P. is believed to be a citizen of the State of California.  On information and belief, this Defendant is a registered investment advisor.

19.    Defendant LBS Advisors, Inc. is a corporate entity having as its principal place of business at 110 Newport Center Drive, Second Floor, Suite 200, New Beach, California 92660. LBS Fund, L.P. is believed to be a citizen of the State of California.  On information and belief, this Defendant is a registered investment advisor.

20.    Defendant Hans Andersen ("Andersen"), on information and belief, is a CPA doing business in the State of Utah as or with the corporate entity of Hans Andersen Accounting.

It appears that Hans Andersen worked closely with FFCF, Taylor, Ascendus, and Smith and knew or should have known FFCF, Taylor and Smith were operating a Ponzi scheme.

21.     On information and belief, Defendant David Christopher Taggart ("Taggart") is a resident of Utah or Washington. Mr. Taggart was Donnell's designated financial advisor with Great Eastern Securities, should have known of trading irregularities in Donnell's accounts, and owed fiduciary duties to Donnell.

22.     On information and belief, Defendant Consilium Trading Company ("Consilium") is a company which does or did business in Utah. On information and belief, Consilium received a portion of Donnell's funds and was part of the group responsible for overseeing and managing her accounts. Consequently, Consilium owed fiduciary duties to Donnell. Consilium appears to be owned or controlled by Newton Taylor, a felon convicted of securities fraud and Roger Taylor's father.

23.     Defendant Teach Me To Trade is an entity that did business in the State of Utah and knew or should have known of the misrepresentations and omissions made by Taylor, who on information and belief, was affiliated with Teach Me To Trade.

24.     On information and belief, Defendant Linda Woolf ("Woolf") is a resident of Utah and was an instructor with Teach Me To Trade. Woolf assisted in persuading Donnell to invest with Taylor.

25.     Defendant Susan Smith is the wife of Defendant Richard Smith. Susan Smith knew or should have known FFCF, Smith and Taylor were operating a Ponzi scheme. Susan Smith signed numerous checks for or on behalf of FFCF, received checks from Summit, and was a participant in the business activities and practices of Ascendus.

26.   Jeff Roylance ("Roylance") is a citizen of the State of Utah.  He is Roger Taylor's brother-in-law.  On information and belief, Smith, Taylor and possibly others sought and obtained funds from Donnell for the benefit of Roylance.  On information and belief, Roylance received commissions from investments made by Donnell.  In addition, Roylance owns and/or controls Defendant Summit Capital Advisors, Inc.  On information and belief, Roylance was also appointed a Director of Superwire, Inc..

27.   Defendant Summit Capital Advisors, Inc. ("Summit") is a Utah corporation, with its principal place of business located at 224 South Main, Suite 456, Springville, Utah 84663.  Summit is believed to be a citizen of the State of Utah.  On information and belief, Summit Capital Advisors, Inc. is a registered investment advisor.

## VENUE AND JURISDICTION

28.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1332(a) based on complete diversity of the parties and damages in excess of $75,000.00 per Defendant.  As indicated above, at the time she initiated this litigation Donnell was a resident of Illinois.  No other Defendant resides in Illinois.  Independent of diversity, this Court also has jurisdiction over the federal securities claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the remaining claims.

29.   Venue in this District is appropriate, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the dispute occurred in this District, a substantial part of the property that is the subject of this action is or has been situated in this District, and/or this Court has personal jurisdiction over each of the parties as alleged in this Complaint.

30.     Personal jurisdiction exists over each of the Defendants either because they are a resident of Utah, have a principal place of business in Utah, or under the Utah long-arm statute, Utah Code Ann. § 78B-3-205, because each of them has transacted business within Utah, contracted with a Utah Corporation, or otherwise caused an injury in Utah.

## FACTUAL BACKGROUND

31.     Donnell first heard about an investment opportunity involving Roger Taylor in early 2003.  Donnell had recently lost her job with Juniper Networks and attended a seminar in Salt Lake City called "Teach Me to Trade."  She knew nothing about trading, investing, or the stock market.  At that seminar, Woolf, an instructor with Teach Me To Trade, told Donnell about Taylor and his ability to generate large profits for investors and that he would effectively protect her investments using "stops" and other tools.  Woolf further told Donnell that Taylor would protect Donnell's central asset, stock in Juniper Networks, and that Taylor would grow her assets.  Donnell reasonably relied on these statements and pursued a relationship with Taylor.  On information and belief, Taylor also was a Teach Me To Trade instructor.

32.     Through subsequent conversations with Woolf and Taylor, Donnell came to understand that Taylor was the founder and President of Defendant Ascendus.

33.     Woolf received checks from Ascendus.  These checks were labeled "bonuses."

34.     On information and belief, Woolf was charged with three counts of wire fraud relating to Teach Me To Trade investment seminars she presented.  Woolf made millions of dollars in commissions from people like Donnell in tuition for seminars, in referring investment advisors like Taylor to students like Donnell, and in selling further classes to participants..

35.     Donnell was not an accredited investor.

36.     On April 15, 2003, Taylor sent an email to Donnell in which he indicated that he had reviewed her assets and that he had "some ideas about what we can do to attain the results that you are looking for."

37.     On April 21, 2003, Taylor wrote an email to Donnell in which he stated that he didn't see a big problem generating an $11,000 monthly return on Donnell's account.

38.     On April 22, 2003, Taylor sent an email to Donnell in which he represented that he and his firm, Ascendus, believed in accountability, and that they had an internal goal of generating 4% per month net of their fees.

39.     On that same day, Taylor responded by separate email to an earlier email by Donnell in which she indicated she may want to invest in bonds.  Taylor told her that "it would be a very smart investment, [but] I do not believe it would be smarter than utilizing my firm." Taylor represented that his historical returns had been 4% per month.

40.     Prior to investing, Donnell told Taylor and Smith her investment objectives, which included the importance of preserving her principal and paying off her margin balance. She told Taylor that she expected him to put "stop" orders on her Juniper and other stocks to prevent substantial losses and informed him that her prior broker had failed to do so.

41.     Both Taylor and Smith affirmatively stated to Donnell that Taylor would place stops on her stock to protect against substantial losses.

42.     Prior to Donnell investing any funds with Taylor and Smith or their co-defendants, Taylor provided a chart to Donnell showing a 42% annual return for his fund compared to losses for similar periods in the Dow Jones Industrial average and the S&P.  Taylor and Smith continued to persistently pursue Donnell to invest in their "fund." For example, on or

about May 12, 2003, Taylor represented that his fund would "make $25,000.00 per month easily." He and Smith also made independent claims of "huge returns" if Donnell would invest. On May 19, 2003, Donnell asked Taylor whether he was registered with the SEC. He responded "yes" and that "Linda [Woolf] has already done the homework for you on this one."

43. Donnell was interested in meeting with Taylor prior to entrusting her savings to him. Such a meeting was set up in May 2003, and Donnell traveled to Utah. However, prior to the meeting, Taylor indicated he would be out of town but that he would send a business associate to meet with her. This business associate turned out to be Smith, who sought to further persuade Donnell to invest in funds that were being traded by Taylor.

44. Smith and Taylor represented to Donnell that Taylor was a trader who was able to generate substantial returns on investors' money while protecting their investments.

45. Eventually, Donnell invested almost all of her net worth with Taylor and the companies with which he was affiliated. She did so based on representations made to her by Woolf, Taylor and Smith.

46. Following her initial investments, Donnell repeatedly communicated with Smith and sometimes with Taylor regarding the status of her investments. She was told in a July 22, 2003 email that her investments would be "safe and secure." In response to requests by Donnell concerning the status of her investments, Smith told Donnell in a July 25, 2003 email that she should not feel obligated to check on her account daily and that Taylor was handling her account "personally."

47. Donnell also reiterated her desire that Taylor set "stops" on her Juniper Networks stock, which represented a large portion of her net worth, and which traded at over $30 per share in 2004.

48. On August 1, 2003, Smith sent the first monthly Ascendus account statement to Donnell which indicated that her "Financial Advisor" was Roger E. Taylor. Donnell believed Taylor was her Financial Advisor for all investments she made with Ascendus and, later, FFCF. She also received statements from Great Eastern indicating Defendant Taggart was an additional financial advisor.

49. Also on August 1, 2003, Donnell signed a "Limited Trading Authorization Agreement" that allowed Taylor to trade the funds in her Penson account.

50. In or about August 2003, Taylor and Smith and the entities with which they were involved began paying profits to Donnell. Smith instructed Donnell that of those profits she received, she was to wire a "commission" of 30% of those amounts to Ascendus. She did as directed on a monthly basis.

51. On August 25, 2003, Taylor sent a letter to Donnell indicating that his fund "is up over 36% year-to-date and we are far ahead of the markets overall." He also represented that her investments "should result in a substantial retirement income stream."

52. Donnell's monthly Ascendus statements reflected such profits on a monthly basis, even after accounting for the 30% commission payment to Taylor and Smith. Penson is a company which held the funds belonging to Donnell and which were traded by Taylor.

53. Monthly income to Donnell was one of her investment goals. Donnell told Taylor and Smith that her interests were preservation of capital, as well as a reasonable monthly income.

She specifically communicated this to them in October 2003. Such communications were wholly consistent with her pre-investment communications to Taylor and Smith. Taylor acknowledged this in an email dated October 22, 2003, stating "our goals are capital preservation and then monthly income, in that order."

54. Taylor also represented that his fund had "a positive return for every month this year." He then touted that his fund was up "over 50.8% year-to-date and we are far ahead of the markets overall." He promised in that same email that "[a]s you compound this money over the coming years it should result in a substantial retirement income stream."

55. Also in October 2003, Taylor took a large "short" position on Donnell's behalf in a company known as Netflix. On or about October 28, 2003, Smith indicated to Donnell by email, with a copy to Taylor, as follows: "Roger asked me to email you with regards to the NFLX position in your account. He is concerned with the recent volatility of this stock and the potential effect it could have on our ability to maximize the margin in an account of your size. In addition, it exceeds the risk/loss minimums you have expressed a wish to carry on your account. Roger would like to reallocate it to the Ascendus general account so that it will not potentially affect your future margins."

56. As part of this "reallocation," Smith told Donnell that "due to regulations imposed by the Patriots act they need an original notarized copy of all stock transfer orders." Donnell provided this form to Defendant Touch Trade, which, on information and belief, apparently has or had an affiliation with Defendant Great Eastern and other entities involved in the trading or handling of Donnell's funds. Donnell expected the Netflix position to be transferred to the

Ascendus general account as requested by Taylor.  At some point, the document was altered by the letters "DTC" being written over, and replaced with the word "move."

57.     On February 24, 2004, Donnell asked Smith a question regarding the Netflix transaction.   Smith responded the following day that Roger would have the information necessary to respond.  On February 28, 2004, presumably after talking to Taylor, Smith wrote to Donnell that "Netflix neither added to nor subtracted from your account I will get you a letter stating it was a Rogue order and should have never been in your account."  Donnell learned in mid-2008 that this representation was false.

58.     Further, Donnell recently received information that Taylor and Smith transferred her short position in the Netflix shares not to the Ascendus general account as they promised, but to another investor named Albert Wirth.   The value of these misappropriated shares was $119,200 at the time.  In an email dated November 18, 2003, Taylor confirmed such a transfer had occurred.  But in an email dated July 18, 2008, Taylor then denied transfers of short position from one account to another took place, stating "That is not something we ever did!"  Wirth has subsequently filed a complaint in this Court against Taylor and others, Case No. 2:09-cv-229.

59.     Such behavior was contrary to Donnell's justified expectations.  It was important to Donnell that Taylor be cautious with her funds.  She communicated this repeatedly to Taylor and Smith.  Among other things, she requested on multiple occasions that "all trades must be protected," that she wanted "no more than 8 to 10 percent risk of a position," and that "stops" should be put in place to preserve all of her positions, especially in the Juniper stock that represented a large portion of her accounts.

60. Despite these specific instructions, Taylor sometimes sought to entice Donnell to take greater risks with her accounts. In an email Taylor sent to Donnell on November 18, 2003, Taylor indicated, "[a]s to the 8-10 percent . . . I can do that, but you may see greatly diminished returns and I do not think it wise with this strategy. If you will permit, let me give you a modified version of a letter wrote to one of my clients who had the same type concerns last year. He is very happy with us still and we made him 42.15% last year." (Emphasis in original).

61. Taylor also told Donnell he would "make a great monthly income or be able to enjoy monthly compound interest and toast most every fund manager on a yearly basis." (Emphasis in original).

62. It also appears Defendants were similarly irresponsible regarding Donnell's specific instructions concerning her accounts. As set forth above, Donnell was concerned about her "margin account," and asked that it be paid off as quickly as possible to avoid interest charges and additional risk.

63. On or about September 29, 2003, Donnell sent $80,000.00 to Ascendus, which she directed be used towards paying off her margin account.

64. On or about October 2, 2003, Smith told Donnell: "I just heard from Penson that the wire arrived it was applied toward your margin. This should really increase our ability to generate good returns on your account."

65. On or about October 29, 2003, Donnell asked for information on her margin balance, indicating her belief that she had paid $90,000.00 toward her margin account. Via email copied to Taylor, Smith informed Donnell that her margin balance was only $37,557.29.

66. During this time period, Donnell reiterated to Taylor and Smith that she wanted them to pay off her margin account.

67. Donnell received a statement indicating that her margin balance was $193,168.11, far different than the $37,557.29 represented to her a few weeks earlier. She raised this issue with Ascendus by email dated December 12, 2003.

68. In response to this concern, Smith wrote on December 12, 2003 that "[t]hose numbers are accurate, BUT it is not what you would be on the hook for or your responsibility." Donnell was also told that Taylor's strategy "protects your stock and we protect your margin."

69. On or about December 13, 2003, Smith said in an email to Donnell that her remaining margin balance, "as of next Friday, will be very low." Later, Donnell received an Ascendus statement indicating that her margin had been paid off.

70. On January 20, 2004, Taylor wrote a letter to Donnell and his other "priority clients" in which he talked about his pride in starting Ascendus. He also promised Donnell that "some major changes in the trading department...should make for an exciting 12 months for you profit wise." Indeed, Ascendus statements for the following twelve months indicated dramatic positive returns every single month.

71. Based on her stated monthly returns, Donnell inquired of Taylor and Smith whether one of her friends might also be able to invest. Smith informed Donnell by email dated March 7, 2004 that access to the funds being managed by Taylor was "limited" but that he "might be able to get your friend in."

72. In fact, in reliance on the stellar performance of her investments, she told a friend about Defendants. He invested $50,000 and he was told that "Roger is the 'lead' trader, but they

have between five and seven other guys, apparently, all work closely with Roger, and no one makes a move without Roger's ok . . . ." Like Donnell, it appears these funds were lost, and have never been repaid. Donnell continued to participate in Teach Me To Trade programs, including its Master Trader Training Camp, which promised to teach Donnell to "safeguard your future and investment portfolio."

73. On various occasions in 2003 and 2004 Donnell became confused over the information in the Ascendus statements and the Great Eastern statements. She raised these issues with Smith. Smith represented that the Ascendus statements were an accurate and reliable indicator of her "net worth." Then in or about May 2004, Taylor and Smith sent a letter to Donnell in which they represented to Donnell and all other Ascendus clients that "[t]he Ascendus statements are accurate and can be utilized by your accountants for tax purposes." When Donnell raised specific questions, she was consistently told that she was misinterpreting the data and that the data actually did not apply to her individual account but rather to Ascendus overall.

74. On information and belief, Defendants Great Eastern, and Touch Trade, and potentially others, all received commissions that were taken from Donnell's account. These commissions were contrary to representations made to Donnell regarding the commission structure.

75. Defendants had access to Donnell's account. For example, Smith sought and obtained Donnell's password, giving him and other Defendants online access to her account.

76. As set forth above, part of the stocks that represented assets in Donnell's account were a number of shares of Juniper Networks. Prior to investing with Taylor, Smith, and their companies, Donnell had worked for several years for Juniper. Through that employment, a

portion of which was pre-IPO, she received a sizeable number of Juniper shares, which represented a significant portion of her overall net worth. Eventually, she was laid off by Juniper, which was one of the reasons she sought a safe haven and reasonable monthly payments on her investments with Taylor.

77. At the Teach Me To Trade seminar where Woolf told Donnell about Taylor's prowess in generating large returns for his investors, Woolf also told Donnell that Taylor protected his clients' investments using stop losses and other mechanisms. During the seminar, Donnell realized that she had lost millions of dollars because her prior broker had not used such tools in managing her Juniper shares. As mentioned above, Donnell conveyed this information to Taylor and Smith even prior to investing with Taylor.

78. Prior to investing with Taylor, Donnell gave specific instructions to Taylor that he should actively monitor her Juniper stock and set stops on that stock to prevent large losses. Although he agreed to this, he failed to do so. Indeed, Taylor actually purchased additional Juniper stock rather than selling Juniper stock at specific "stop loss" prices as previously directed by Donnell. Even though Juniper sold higher than $30 per share during portions of 2004, Taylor failed to set stops on that stock, and the price fell by more than one-third thereafter, causing significant losses to Donnell.

79. This was contrary to prior promises by Taylor and Smith. For example, on July 22, 2003, Smith stated: "As Roger and I discussed your account this is the information we wanted to pass on to you . . . your stock is, and always will be, safe and secure." Similarly, on May 10, 2004 she was informed by Taylor that the manner in which he was handling her funds, including her Juniper stock, was a "low risk" strategy.

80. Despite Donnell's specific instructions about setting stop losses on Juniper stock to prevent losses in her account, and prior promises to protect her stock, Taylor failed to sell the stock as directed, resulting in a significant loss. To cover up what had happened, Taylor and Smith made false representations about the Juniper stock to Donnell that were not discovered until 2008. Further Juniper purchases were made without Donnell's knowledge and stop losses were never implemented in the form promised by Taylor. Although Donnell should have received a transaction report of every trade made by Taylor, she never received this information.

81. Donnell also has discovered that further stop loss orders were not honored, and Juniper stock was not sold until approximately February 20, 2006. It was liquidated at a substantial loss to Donnell in order to facilitate a transfer of funds to another program run by Taylor, Smith, LBS, Roylance, Summit Capital Advisors, and others.

82. On information and belief, Taylor, Smith, Newren, Taggart, Roylance, Summit, Touch Trade, Great Eastern, and others improperly caused significant losses in Donnell's account before, during, and after the transfer of funds from Penson to FFCF or otherwise failed to see that her funds were safely transferred and then protected as promised. It appears Ascendus was only licensed to trade or otherwise transfer funds in Donnell's account until December 2005, prior to the alleged transfer of some or all of Donnell's Ascendus funds to FFCF and LBS. However, trading continued into early 2006.

83. Donnell was told her entire Penson balance was transferred to FFCF in early 2006, yet Donnell has learned that not all of her Penson funds were actually transferred. As one small example, Smith claimed that Donnell's Penson account showed a transfer of $88,532.10 to FFCF, which Donnell now knows did not arrive in her FFCF account, despite Defendants'

statements to the contrary.  Andersen also provided a document wrongfully indicating this transfer took place.  Moreover, recent disclosures suggest that only approximately $332,000 made it into the FFCF account, rather than the dramatically higher figure that should have been transferred.

84.    Donnell was persuaded to allow the transfer of her funds out of Penson and into FFCF, a company, on information and belief, totally controlled by Taylor, Summit Capital Advisors, Roylance, and LBS.  Donnell was told FFCF was a safer program for her funds which would bring higher returns and that Taylor would continue managing her money.  Defendants Smith and Susan Smith traveled to San Diego to induce Donnell to transfer her funds to FFCF. At that meeting Smith acted on behalf of Roylance and Summit, and provided Donnell with materials and investment information he received from Roylance and Summit.  On information and belief, Roylance, Smith, Taylor and others received commissions as a result of Donnell and other Ascendus investors moving money into FFCF and LBS.

85.    Throughout the time Donnell's funds were with Ascendus, her monthly Ascendus statements reflected significant returns every single month.  This was also true with FFCF.

86.    Tax documents Donnell received from Defendants and others supported Donnell's belief that she had significant assets in her account.

87.    For example, for tax year 2006, FFCF released a K-1 indicating that Donnell's ending capital account was worth $1,948,051.15.  FFCF's K-1 to Donnell for tax year 2007 indicated an ending capital account balance of $2,153,573.56.

88.    The FFCF Operating Agreement dated January 23, 2006 states as follows: **"The sole initial Manager of the Company shall be Roger E. Taylor**.  The Manager shall direct,

manage and control the business of the Company and shall have full and complete authority, power and discretion to make any and all decisions and to do any and all things which the Manager shall deem to be reasonably required . . . ."  (Emphasis added).

89.    The FFCF Operating Agreement further states that "Roger E. Taylor shall serve as the Manager of the Company until his resignation, removal, death, Legal Incompetency or Financial Insolvency . . . ."

90.    On information and belief, Taylor signed Donnell's FFCF Subscription Agreement, listing himself as Manager of FFCF.  In that document, Taylor certifies that the sum of $1,486,791.44 was transferred into FFCF on Donnell's behalf by Taylor and Smith.  The Subscription Agreement was an improper and insufficient disclosure document.

91.    The FFCF Subscription Agreement refers potential investors to the FFCF Operating Agreement, which designates Taylor as FFCF's sole Manager.

92.    The FFCF Subscription Agreement indicates that any notices to FFCF are to be sent to Taylor's attention.

93.    On information and belief, Taylor wrongfully transferred millions of dollars into and out of FFCF, just as he had done with Ascendus.

94.    Further, the FFCF domain name listed Taylor as the owner, and on information and belief using his home address and name.

95.    Donnell later invested an additional $401,000 into FFCF, showing her trust in Taylor and Smith, her reliance on the information Smith had conveyed to her on behalf of Roylance, Taylor, Summit, and LBS, and her belief that prior investments with them and other

Defendants had performed well.  An FFCF statement sent by Defendant Andersen confirms that approximately $400,000 was added to her FFCF account.

96.     Taylor has subsequently denied, through a letter from his counsel dated August 29, 2008, that he was ever a manager of FFCF, as well as indicating directly on a separate occasion that while he was a manager of FFCF, he didn't realize it.  Such statements are contrary to his prior conduct.  Moreover, he previously suggested to Donnell that he was the one who signed the Subscription Agreements on behalf of FFCF.  The Wirth Complaint referenced herein and on file with the Court provides additional evidence that Taylor played a central role in FFCF's business, such as actively and successfully persuading Wirth to invest in FFCF.

97.     Smith indicated by email to Donnell on October 14, 2007 that all funds she put into FFCF (called the "bond product") was "principal guaranteed."

98.     FFCF purportedly put its investors' funds with Defendant LBS Management, located in Newport Beach, California.  FFCF would sometimes use this same address as a business address.  Defendant Susan Smith and other Defendants were familiar with FFCF's financial condition and signed checks on behalf of FFCF.

99.     Donnell was promised by Summit Capital Advisors, LBS, Taylor, and Roylance, through their agent Smith, that her funds would be held by Societe Generale, one of the largest financial institutions in France.  The operating agreement of FFCF restricted the use of investor funds to that specific program, which was touted as being safe and secure.  Taylor had actual knowledge of this provision in the Operating Agreement and willfully disregarded it.

100.    Roylance, Summit, Taylor, and Smith all received significant portions of funds placed in FFCF, including a share of Donnell's investments.   This was never disclosed to Donnell.

101.    Subsequent documents provided to Donnell indicated that the balance of funds in her FFCF account exceeded $2 million.   For example, on information and belief Andersen appears to have prepared the FFCF statements.   He indicated that such statements were prepared in accordance with "proper and accepted accounting practices."   One such statement, apparently prepared by Andersen, for the time period ending June 20, 2006 represented that Donnell's account contained $2,057,712.96.

102.    Based on information recently revealed to Donnell, it now appears that Taylor, Smith, Roylance and companies that they own or control transferred funds out of Donnell's name and misappropriated them.   This misconduct was ongoing throughout the time Donnell had funds with Ascendus and FFCF.   Donnell was told in late November 2008 for the first time that Defendants no longer have any of her money and that it has all been "lost."

103.    Based on her belief (now shown to be misguided) that Taylor had properly managed her account, in March 2008, she agreed to invest the sum of $115,000 toward what she was told was an "oil well loan."   Donnell was promised a $30,000 return on this investment.   She wired this investment to Ascendus as directed by Smith.   When Donnell's investment was not repaid with the promised $30,000 return by its due date of April 19, 2008, she was promised an additional $65,000, for a total of $210,000.00, to be paid by close of business on July 7, 2008. Nothing has been paid towards this debt.   Donnell later discovered that Defendants had sent her

investment to a company called Superwire, Inc. Roylance, Smith, and Taylor are all, or have been, affiliated with Superwire.

104. On July 13, 2008, Donnell sent an email to Smith. Defendant Susan Smith responded, informing Donnell that Smith had taken a bottle of pills and was hospitalized. In subsequent emails, Susan Smith told Donnell that Smith was of no help in responding to Donnell's urgent inquiries about the status of her account.

105. Susan Smith informed Donnell on July 23, 2008, that the Ascendus account where the $115,000 had been wired for the investment in the "oil well loan" had been closed and had a zero balance.

106. On July 16, 2008, Taylor sent an email to Donnell urging her not to contact the Attorney General's Office or the "Feds." He indicated to her that such an approach would result in "no money or very little" and that if she would just "work with me for a few months = money."

107. Twelve minutes prior to that email, Taylor sent another email urging Donnell not to seek legal counsel because it would "dramatically slow this process into the years and years."

108. On July 17, 2008, Taylor sent a letter to FFCF investors indicating that Smith had acknowledged wrongdoing and had attempted suicide. Taylor also represented that there were gains in FFCF.

109. On July 21, 2008, Taylor sent an email to Donnell in which Taylor indicated that he "was always communicating to Richard in report form."

110.   Taylor's counsel informed Donnell, through her attorney, that Taylor never lost funds while trading Donnell's account, suggesting that her funds have been misappropriated rather than lost through unauthorized and unsafe trading practices.

111.   Thus, Defendants have had control over Donnell's now missing funds.   For example, only recently did Donnell learn that Defendant Consilium had an apparent role in holding and managing some of her now missing funds and in preparing marketing materials used by FFCF, LBS, Roylance, Taylor, Smith and Summit.

112.   In summary, as a result of Defendants' collectively fraudulent, negligent or otherwise improper conduct, Donnell has been harmed by the following losses:  (1) significant losses in her Ascendus account; (2) the additional $401,000.00 she invested into FFCF; (3) $210,000 for the oil well loan; (4) over $100,000 relating to margin control issues; (5) $119,200 from the improper Netflix transaction; (6) amounts lost as a result of failing to properly manage her Juniper stock; and (7) not less than $159,273.52 in "commissions" to Ascendus as well as significant "commissions" paid to Roylance, Taylor, Smith, Summit Capital Advisors, Consilium, FFCF, LBS, Great Eastern, and possibly others.  In addition, Donnell is entitled to interest on the amounts, plus costs and attorneys fees.

### FIRST CLAIM FOR RELIEF
(Fraud/Intentional Misrepresentation)

113.   Donnell realleges and incorporates herein all of the allegations set forth elsewhere in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

114.   Defendants in this case committed numerous acts of fraud.

115.   Among the material misstatements are the following:

a.      That Taylor would protect Donnell's Juniper stock and grow her assets.

b.      That she was not "on the hook" for margin balances.

c.      That her margin had been paid off.

d.      That Ascendus' statements were the most reliable indicator of Donnell's net worth.

e.      That Ascendus' statements were accurate for tax purposes.

f.      That the manner in which Taylor was handling Donnell's funds was a "low risk" strategy.

g.      That the NetFlix position neither added to or subtracted from her account and was transferred to the Ascendus general account.

h.      Repeated assurances that her investments should result in a substantial retirement income stream.

i.      That information provided by Defendants to Donnell about the cost basis of her Juniper stock was accurate.

j.      That $1,486,791.44 from Donnell's Penson account was transferred to her FFCF account, followed by an additional transfer of $88,532.10.

k.      That Taylor was not a manager of FFCF.

l.      That account statements accurately reflected Donnell's account balances.

m.      That her FFCF investment was "principal guaranteed."

n.      That her FFCF investment was safe and a less risky place for her money to be invested.

o.      That her investments in FFCF made steady returns.

p.      That her FFCF statements were accurate.

q.      That Taylor, Woolf, and Smith were worth many millions of dollars.

r.      As set forth in the FFCF operating agreement, that her FFCF investments would be and were held by Societe Generale.

s.      That HJ & Associates was creating the FFCF documents.

t.      That Ascendus was subject to audit.

u.      That FFCF was subject to audit.

v.      That Taylor had achieved stellar trading results with Ascendus.

116.    Among the material omissions are the following:

a.      That a significant portion of her funds had been transferred away from her and to other third parties.

b.      That she had a margin balance and was being charged interest on it.

c.      That her so-called profit payments were merely being paid out of her own margin balance, thereby increasing her debt.

d.      That the Defendants had transferred funds belonging to her to other investors to keep their Ponzi scheme going.

e.      That instead of selling Juniper stock pursuant to Donnell's repeated "stop loss" instructions, Taylor actually purchased additional Juniper stock. Furthermore, Taylor ignored numerous requests for "stop losses."

f.      That Taylor failed to set "stops" on Donnell's Juniper stock.

g.      What happened to Donnell's Juniper holdings when her Penson account was liquidated.

h.      Omitting to tell Donnell until mid-2008 that her funds were "lost."

i.      That the amounts reflected in the Ascendus, Great Eastern, and FFCF
        account statements were inaccurate.

j.      That all of her funds in Ascendus were not transferred to FFCF.

k.      That the funds invested with FFCF and LBS were not guaranteed, were
        not with Societe Generale, and had been invested in a Ponzi scheme.

l.      That Taylor had allowed critical licenses to lapse related to authority to
        trade securities and provide securities and financial advice.

m.      That people other than Taylor were trading in her account.

n.      That her funds would be transferred to Consilium before being sent to
        FFCF, and that the owner of Consilium was a convicted felon, Newton
        Taylor, who also happened to be Taylor's father, and that Consilium had a
        role in preparing marketing materials for FFCF and others.

o.      That her funds would be transferred to Summit prior to being sent to LBS.

p.      That the $115,000 deposited in the Ascendus account on March 19, 2008
        was for an oil well loan.

q.      That her $115,000 "oil investment" was instead sent to Superwire, Inc. on
        March 19, 2008 without her knowledge or consent.

r.      That distributions of Donnell's "profits" to her, and on which she paid
        commissions, were in fact simply taken from Donnell's margin account,
        thereby causing her to accrue further debt.

s.      That Smith had previously been convicted of forgery.

h.   That Taylor had been involved with a company that had been sued and had entered into a settlement agreement to resolve the claims alleged in the lawsuit.

i.   That deposits made by Donnell to pay off margin were not applied as promised.

117.   Defendants' statements and omissions were false or misleading and Defendants knew at the time that they were false and misleading or such statements were made with Defendants' reckless disregard for the trust thereof.

118.   Donnell reasonably and actually relied on these misrepresentations and omissions to her detriment.

119.   As a result of the misstatements and omissions, Donnell has been damaged in an amount to be proven at trial, but which is reasonably expected to exceed $4 million.

120.   As a result of the willful and wanton nature of Defendants' conduct, Donnell is entitled to exemplary damages in an amount to be proven at trial but which are expected to exceed $12 million.

## SECOND CLAIM FOR RELIEF
(Breach of Contract)
(Taylor, Smith, Ascendus, FFCF, Great Eastern, Taggart, Newren, LBS)

121.   Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 in this Complaint as though fully set forth herein.

122.   Donnell entered into agreements with certain Defendants through which those Defendants agreed to manage her investments and to generate returns consistent with her investment objectives.   These Agreements include the Limited Trading Authorization

Agreement, the Subscription Agreement, and certain other oral and implied agreements. Pursuant to these agreements, Donnell was promised that her principal would always be "safe and secure," that her margin would be paid off, that stop losses would be used, and similar terms set forth above in exchange for Donnell's continued investment with Ascendus and FFCF.

123. Donnell fully performed her obligations under those agreements by maintaining her investments with Ascendus and FFCF, and by investing additional monies in exchange for promises by Defendants that such funds would only be used as set forth above.

124. Defendants failed to perform as promised and agreed, repeatedly breaching the agreements by improperly using margin, by failing to maintain and protect Donnell's investment funds as promised, by failing to follow the parties' agreements with respect to specific trades for Juniper stock, and by otherwise misusing her funds. Such conduct represents breaches of the oral agreements, the Subscription Agreement, and the Limited Trading Authorization Agreement.

125. In addition, Taylor has recently admitted through counsel that Defendants Smith and FFCF took funds belonging to Donnell and transferred them to other FFCF investors. This apparently was done in order to perpetuate the Ponzi scheme being operated by certain of the Defendants. Such conduct also represents a breach of contract. Taylor was involved in this misconduct.

126. As a result, Donnell has been damaged in an amount to be proven at trial but which she reasonably expects will exceed $4 million.

### THIRD CLAIM FOR RELIEF
(Breach of Contract—Oil Well Loan Agreement)
(Smith, Smith Holdings, and Ascendus)

127.    Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

128.    Donnell entered into an agreement with Smith, Smith Holdings, and Ascendus through which she loaned these entities the total amount of $115,000.  In return she was to receive the sum of $210,000.  As set forth above, these funds were misappropriated by Defendants.

129.    Donnell fully performed her obligations under this agreement.

130.    Defendants Smith, Smith Holdings, and Ascendus failed to abide by their contractual commitments by failing to pay Donnell the sum of $210,000 by July 7, 2008 and by failing to invest the funds as promised.

131.    As a result of this breach, Donnell is entitled to the sum of $210,000, plus interest, costs, and attorneys' fees.

### FOURTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty)
(All Defendants)

132.    Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

133.    Defendants held themselves out to Donnell as professionals skilled and experienced in acting as investment advisors, fund managers and/or accountant professionals, as applicable.

134.   Defendants owed a fiduciary duty to Donnell by soliciting and/or accepting responsibility for protecting, tracking and/or investing her life savings.

135.   As a result, Defendants had a duty of utmost care to act in Donnell's best interest and appropriately protect Donnell and her investments.  Furthermore, given the position of trust granted to them by Donnell, Defendants had a duty to ensure that information provided to Donnell verbally and in written form were accurate, complete and truthful.

136.   In breach of their fiduciary duties, Defendants failed to protect the interests of Donnell, and acted in accord with their pecuniary interests, by, among other ways, allowing her funds to be misappropriated, by directly transferring them to others who had no right to such funds, by misrepresenting material facts to Donnell, by omitting to tell her critical facts that would have allowed her to preserve and protect her investment, by failing to exercise proper care in performing services for the benefit of Donnell, by failing to pay off her margin account, by misusing her margin account, by otherwise failing to appropriately maintain and protect her assets and by failing to properly use and repay funds supposedly invested in oil properties, plus interest.

137.   In further violation of their fiduciary duties, Defendants failed to follow express instructions of Donnell regarding trading of Juniper stock for their own purposes.

138.   As a direct and proximate result of these breaches of fiduciary duties, Donnell has been damaged in an amount to be proven at trial, but which is reasonably expected to exceed $4 million.

139.    Due to the willful and wanton misconduct of the Defendants, Donnell is entitled to exemplary and punitive damages in an amount to be proven at trial but which are expected to be no less than $12 million.

## FIFTH CLAIM FOR RELIEF
(Conversion)
(All Defendants)

140.    Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

141.    Defendants held the funds Donnell invested with them in trust.  In violation of Donnell's rights, Defendants converted Donnell's funds to their own use by transferring her funds to third parties without authority and by otherwise using Donnell's funds for their own pecuniary interests.  One of these third parties appears to be Defendant Consilium.  Another appears to be Defendant Roylance.  And another is Superwire.  In addition, Defendants Taylor, Smith and Ascendus wrongfully used Donnell's Juniper shares and her margin account without authority and for their benefit or the benefit of third parties.  Further, many of the Defendants, including Taylor, Roylance, Smith, Taggart, Newren, LBS, Woolf, Touch Trade, Great Eastern, Consilium, Summit, and others received improper "commissions" from Donnell's funds.

142.    As a result of such conversion, Donnell has been damaged in an amount to be proven at trial, which is reasonably expected to exceed $4 million.

## SIXTH CLAIM FOR RELIEF
(Accounting)
(All Defendants)

143.    Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

144.    As a member of and investor in Ascendus and FFCF, Donnell is entitled to an accounting and inspection of what Defendants Taylor, Smith, Ascendus, FFCF, Smith Holdings, Summit, Great Eastern Securities, Touch Trade, Roylance and LBS Management did with her funds.

145.    Consequently, Donnell seeks an order compelling all Defendants to provide complete access to all books and records of their companies and individually in order for Donnell to ascertain the disposition of her funds.

**SEVENTH CLAIM FOR RELIEF**
(Unjust Enrichment/Quantum Meruit)
(All Defendants)

146.    Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

147.    Defendants knowingly retained funds belonging to Donnell for their own pecuniary purposes.  Defendants' conduct was inequitable on account of their positions as investment advisors and/or professionals entrusted with the preservation and investment of Donnell's life savings or because certain of the Defendants were third parties who received Donnell's funds without adequate consideration.  Consequently, Defendants have been unjustly enriched.

148.    Therefore, Donnell is entitled to an order compelling Defendants to return to Donnell any and all of her funds they received, directly or indirectly, plus accrued interest, costs, and attorneys fees.

**EIGHTH CLAIM FOR RELIEF**
(Professional Negligence)
(Hans V. Andersen)

149. Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

150. On information and belief Defendants Andersen and Hans V. Andersen Accounting ("Accounting Defendants") performed services for and on behalf of Donnell. As alleged above, the Accounting Defendants purportedly provided audited FFCF statements, including Donnell's FFCF statement.

151. The Accounting Defendants owed a duty to Donnell.

152. The Accounting Defendants breached this duty by failing to perform their professional services in a reasonable manner. The Accounting Defendants claimed that they conducted an analysis of Donnell's FFCF balance and repeatedly affirmed that she had, at times, in excess of $2 million in her FFCF account. In fact, it now appears that she did not have those funds in her account. The Accounting Defendants failed to recognize this fact and failed to notify Donnell as required. In addition, Accounting Defendant Andersen provided confirmation of various transfers into the FFCF account which may not have occurred.

153. In this regard, the Accounting Defendants' behavior fell below the reasonable standard of care for similarly situated accountants performing similar services.

154. Had Donnell known of the true situation with respect to her FFCF account, she would have acted far differently than she did.

155.   As a result of the professional negligence of the Accounting Defendants, Donnell has been damaged in an amount to be proven at trial, but which is reasonably expected to be no less than $4 million.

156.   In addition, based on the willful, wanton, and reckless nature of the Accounting Defendants' misconduct, Donnell is entitled to exemplary damages in an amount to be proven at trial.

### NINTH CLAIM FOR RELIEF
(Negligence)
(All Defendants)

157.   Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

158.   Each of the Defendants owed a duty of care to Donnell in their capacity as investment advisors and/or professionals.  Each of them had specific responsibilities regarding the investment of Donnell's funds, reporting information, managing her account, or otherwise protecting her funds.

159.   The Defendants breached their duties as set forth in this Complaint by, among other things, engaging in unsuitable and risky investments given the investment objectives, risk tolerances and express investment instructions of Donnell; perpetrating high-risk investment activities contrary not only to Donnell's instructions, but to Defendants' express representations; furnishing Donnell incomplete and false information regarding the status of her investment accounts and the transfer of funds from one account to another;  by failing to honor her reasonable instructions regarding stop losses; by failing to properly transfer and protect her funds; by failing to keep accurate records; by failing to protect and reduce her margin account;

by misappropriating Donnell's funds and assets; and by allocating Donnell's funds for the use of Defendants' pecuniary gain or payment to third parties.

160. As a result of these breaches of duty, Donnell has been damaged in an amount to be proven at trial, but which is reasonably expected to be no less than $4 million.

161. Because Defendants' conduct was willful and wanton, Donnell is also entitled to exemplary damages in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF
(Securities Fraud - Federal - Sections 10(b) of the Exchange Act 15 -
U.S.C. § 78j(b): and Rule 10b-5 Thereunder, 17 C.F.R. §§ 240.10b-5) (All Defendants)

162. Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

163. In connection with the activities described in the foregoing paragraphs of this Complaint, Defendants, singly and in concert, directly and indirectly, in connection with the purchase and sale of securities, by use of the mails and other instrumentalities of interstate commerce (a) employed devices, schemes, and artifices to defraud Donnell; (b) made untrue statements of material fact to Donnell and omitted to state to Donnell material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of conduct that operated or would operate as a fraud and deceit upon Donnell.

164. The purpose and effect of this scheme, plan and unlawful course of conduct was, among other things, to induce Donnell to maintain her investment with Defendants while such scheme was perpetrated and continue to invest additional funds with Defendants.

165. As a result of Defendants knowing and/or reckless disclosure of materially misleading facts and statements and Defendants intentional and/or reckless omission of material facts regarding Donnell's investment, the information disseminated to Donnell was materially false and misleading as set forth above. Donnell reasonably and actually relied on the above-described false and misleading statements by maintaining her investment with Defendants and continuing to invest additional funds with Defendants. In ignorance of the false and misleading nature of the statements and omission described above and the deceptive and manipulative devices and contrivances employed by Defendants, Donnell, to her detriment, relied on Defendants' representations. Had been furnished accurate and truthful information, she would not have maintained her investment with Defendants or invested additional funds with Defendants. By virtue of the foregoing activities, Defendants violated Section10b of the Exchange Act, 15 U.S.C. § 78j(b), and Rule R10b-5 thereunder, 17 C.F.R. § 240.10b-5, and are liable to Donnell for so doing.

166. As a direct and proximate consequence of this wrongful and fraudulent conduct by Defendants, Donnell has been damaged and Defendants are liable for an amount to be proven at trial, which is reasonably expected to exceed $4 million, plus interest thereon, along with all other available relief, including punitive damages.

### ELEVENTH CLAIM FOR RELIEF
(Securities Fraud - Utah - Utah Uniform Securities Act, Utah Code Ann. § 61-1-1 and § 61-1-22(4)(a)) (All Defendants)

167. Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

168.    In connection with the activities described in the foregoing paragraphs of this Complaint, Defendants, directly and indirectly, in connection with the purchase and sale of securities, by use of the mails and other instrumentalities of commerce; (a) employed devices, schemes, and artifices to defraud Donnell; (b) made untrue statements of material fact to Donnell and omitted to state to Donnell material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business that operated or would operate as a fraud and deceit upon Donnell.

169.    By virtue of the foregoing activities, Defendants violated the Utah Uniform Securities Act, *Utah Code Ann.* § 61-1-1, *et seq.*, and are liable both primarily and secondarily to Donnell for so doing.

170.    As a direct and proximate consequence of these violations of the Utah Uniform Securities Act by Defendants, Donnell has been damaged and continues to be damaged in an amount to be proven at trial, which is reasonably expected to exceed $4 million and, pursuant to *Utah Code Ann.* § 61-1-22, is properly trebled, plus interest thereon, along with all other available relief.

## TWELFTH CLAIM FOR RELIEF
(Section 20 of the Securities and Exchange Act of 1934)
(All Defendants)

171.    Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

172.    Each of the Defendants specified herein, by virtue of their positions as managers, officers, directors, equity holders and/or such acts as described above, were, at the time of the

wrongs alleged herein in breach of the Securities and Exchange Act of 1934, as amended (the "1934 Act"), controlling persons within the meaning of Section 20(a) of the 1934 Act.

173. These Defendants had the power and influence and exercised the same to cause the other Defendants to engage in illegal conducts and practices as set forth in detail above.

174. Each of these Defendants, at all relevant times, by virtue of their management positions and participation in the actions identified above, had actual knowledge of, and exercised control over the dissemination of, the material misstatements and omission set forth above.

175. By reason of such conduct, these Defendants are liable for the wrongful conduct alleged herein, and are liable to Donnell for the damages she suffered in connection with her investments in Defendants Ascendus and FFCF in an amount to be proven at trial, but which is reasonably expected to exceed $4 million.

**THIRTEENTH CLAIM FOR RELIEF**
(Gross Negligence)
(Taylor)

176. Donnell realleges and incorporates herein all of the allegations set forth in paragraphs 1 through 112 of this Complaint as though fully set forth herein.

177. Pursuant to Article 9.4 of the FFCF Operating Agreement, Taylor owed a duty of care to Donnell in his capacity as sole manager of FFCF. Taylor's duty encompassed his responsibility to manage the business and affairs of FFCF and the investments of FFCF's members in a manner that did not constitute gross negligence. Taylor owed Donnell similar duties as President of Ascendus.

178. Taylor breached his duties as set forth in this Complaint by, among other things, failing to account for Donnell's capital investment in Ascendus and FFCF; failing to properly transfer all of Donnell's funds from Ascendus into FFCF and failing to properly protect funds in Ascendus and FFCF; allowing FFCF and Ascendus to furnish K-1 statements and other information to Donnell indicating that she had a significant capital account balance despite the fact that such funds were not actually accounted for; and attempting to persuade Donnell not to contact federal and state securities authorities or contact legal counsel when she discovered that something had gone horribly wrong.

179. By reason of such conduct, Taylor did not observe the appropriate care in managing the business and affairs of FFCF and Ascendus. Furthermore, such conduct was careless and reckless to a degree that indicated Taylor's utter indifference to the eventual loss of Donnell's entire life savings.

180. As a result of this breach of duty, Donnell has been damaged in an amount to be proven at trial, but which is reasonably expected to be no less than $4 million.

181. Due to the willful and wanton nature of the conduct, Donnell also is entitled to punitive damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

WHEREFORE, Donnell prays for relief as follows:

1. ON DONNELL'S FIRST CLAIM FOR RELIEF: For actual and consequential damages as a result of fraud, including interest and attorneys' fees, exemplary and punitive damages, and for such other and further relief as the Court deems just;

2.     ON DONNELL'S SECOND CLAIM FOR RELIEF:  For actual and consequential damages as a result of the breaches of contract alleged, including interest and attorneys' fees and for such other and further relief as the Court deems just;

3.     ON DONNELL'S THIRD CLAIM FOR RELIEF:  For actual and consequential damages as a result of the breaches of contract alleged, including interest and attorneys' fees and for such other and further relief as the Court deems just;

4.     ON DONNELL'S FOURTH CLAIM FOR RELIEF:  For actual and consequential damages as a result of the breaches of fiduciary duty, including interest and attorneys' fees and for such other and further relief as the Court deems just, and for exemplary and punitive damages in an amount to be proven at trial;

5.     ON DONNELL'S FIFTH CLAIM FOR RELIEF:  For actual and consequential damages as a result of the conversion alleged, including interest and attorneys fees and for such other and further relief as the Court deems just;

6.     ON DONNELL'S SIXTH CLAIM FOR RELIEF:  For an Order compelling Defendants to provide complete access to all books and records of their companies and individually in order for Donnell to ascertain disposition of her funds;

7.     ON DONNELL'S SEVENTH CLAIM FOR RELIEF:  For Judgment in favor of Donnell and against Defendants in an amount to be proven to be the amount by which the Defendants have each been unjustly enriched, along with interest, costs, and attorneys fees;

8.     ON DONNELL'S EIGHTH CLAIM FOR RELIEF:  For Judgment in favor of Donnell and against the Accounting Defendants in an amount to be proven at trial, plus interest, costs, attorneys fees and for exemplary and punitive damages in an amount to be proven at trial;

9.      ON DONNELL'S NINTH CLAIM FOR RELIEF:  For Judgment in favor of Donnell and against the Defendants in an amount to be proven at trial, plus interest, costs, attorneys fees and for exemplary and punitive damages in an amount to be proven at trial;

10.      ON DONNELL'S TENTH CLAIM FOR RELIEF:  For Judgment in favor of Donnell and against the Defendants in an amount to be proven at trial, plus interest, costs, attorneys fees, and all other remedies available under applicable federal securities laws;

11.      ON DONNELL'S ELEVENTH CLAIM FOR RELIEF:  For Judgment in favor of Donnell and against Defendants in an amount to be proven at trial, plus interest, costs, attorneys fees, treble damages, and all other remedies available under applicable Utah securities laws;

12.      ON DONNELL'S TWELFTH CLAIM FOR RELIEF: For Judgment in favor of Donnell and against Defendants Taylor, Smith and Woolf in an amount to be proven at trial, plus interest, costs, attorneys fees, and all other remedies available under applicable federal securities laws;

13.      ON DONNELL'S THIRTEENTH CLAIM FOR RELIEF:  For Judgment in favor of Donnell and against Taylor in an amount to be proven at trial, plus interest, costs, attorneys fees and for exemplary and punitive damages in an amount to be proven at trial;

14.      ON ALL CLAIMS FOR RELIEF:  For attorneys fees, costs, and other available relief, including but not limited to punitive damages and applicable penalties; and,

15.      ON ALL CLAIMS FOR RELIEF:  For such other and further relief as the Court deems just under the circumstances.

DATED this 14th day of December, 2010.

PARR BROWN GEE & LOVELESS

/s/      Jonathan O. Hafen
         Jonathan O. Hafen
         Bryan S. Johansen
         *Attorneys for Annette Kay Donnell*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the �j____ day of ▓▓▓▓▓ 2010, a true and correct copy of the foregoing ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **SECOND AMENDED COMPLAINT AND JURY DEMAND,** duly electronically filed and served, via electronic transmission to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the ▓▓▓▓▓ EM/ECF ▓▓▓▓▓ The following parties were served via first class U.S. mail, postage prepaid:

Richard T. Smith
▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓
Orem, UT  84097
*Individually, and on behalf of Smith Holdings & Ascendus Capital Management, LLC*

Hans Andersen
Hans Andersen Accounting
1724 South 165 West
Orem, UT  84058

Chad Miller
1246 Flint Meadow Drive, #102
▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ _____